(Hamilton County Court of Common Pleas.)

IN THE MATTER OF A. H. HAMPTON, FUGITIVE.

1. The power of a judge to discharge an alleged fugitive under the act of 1875 (72 O. L. 79) is essentially the same, as under the *habeas corpus* act (75 O. L. 754). *Wilcox v. Nolze*, 34 Ohio St. 520.

2. The indictment or affidavit charging the person demanded in extradition with crime, under sec. 5278 of the act of congress, and sec. 2, art. 4 of the constitution of the United States, must be *certified as authentic by the governor making the requisition;* and if it appear, in the hearing in *habeas corpus*, or in like proceedings under the statute of Ohio upon the return of the sheriff producing the prisoner before a judge to be examined as to the truth of the charge of being a fugitive from justice, by an inspection of all the original documents submitted to the governor issuing the warrant *or their agreed duplicates* that such indictment or affidavit is not thus certified, then the prisoner is entitled to be discharged and should not be remanded on said warrant.

3. Neither the agent of the demanding state, nor the officer arresting the fugitive under the warrant of the governor are officers of the United States. * * And the states have the right to impose the duty on their own courts or the judges thereof to inquire into the grounds upon which any person within their jurisdictional limits is restrained of his liberty, and to discharge him if the restraint is illegal, and this, notwithstanding such illegality, may arise from the violation of the laws and constitution of the United States. *Robb* v. *Connolly*, 111 U. S. 624. As every alleged fugitive under arrest on his application would be entitled to a hearing before a judge or court in *habeas corpus*, and as sec. 97 of the Revised Statutes of Ohio is but a provision that before a governor shall remand a prisoner to another state, he shall cause him to be brought before a judge for a hearing like unto that in *habeas corpus*, such statutory direction does not conflict with the foregoing act of congress or said constitutional provision. *Wilcox* v. *Nolze*, 34 Ohio St. 520.

4. Whether a prisoner in extradition be a fugitive from justice is a question of fact for the determination of the governor, and the judge in the *habeas corpus* proceedings.*

5. When the proceedings in extradition are in due form of law, good faith is to be imputed to them, but that presumption may be overcome by proofs to the contrary. When the proof establishes that the forms of law have been used for illegal and ulterior

---

*NOTE.—An interesting question arises on another proposition: The extent of the inquiry as to whether one is a fugitive from justice.

In *Roberts* v. *Reilly*, 116 U. S. 80, it was held that a person who commits a crime in one state, and when sought to answer proceedings in prosecution therefor, being found without that state and within another state, is a fugitive from justice within the meaning of the constitution of the United States; but in that case the facts do not present an inquiry in the *purpose in fleeing* as in the case at bar.

Bouvier (1 Bou. Law Dic. 551) defines a fugitive from justice to be "one who having committed a crime in one jurisdiction goes into another in order to evade the law and punishment."

In the Senator Patterson case (see *Washington Post*, Dec. 7, 1877, and sec. 569 Moore on Extradition) Judge Humphries, of the Supreme Court of the District of Columbia, held that although he the prisoner was duly charged with crime committed in South Carolina, yet being sent by the people of that state to Washington City as Senator, *had not fled from justice*; in other words, the judge made inquiry into the purpose of his leaving the state of South Carolina.

Suppose a prisoner, indicted for alleged crime in one state, flees from fear of mob violence which may physically confront him, and does not in fact flee to evade trial by law or avoid punishment thereby, is he a fugitive from justice?

As the judge should inquire and determine as a fact whether he be a fugitive from justice, can he discharge his whole duty without inquiry in such a case as to the *purpose of* the fleeing?

purposes, that such proceedings have been instituted not to prosecute the prisoner, for his crime, according to the law, but to deliver him at a convenient place to kill him, in the exercise of individual vengeance, then the proceeding violates the constitutional purpose, and the judge is not required to aid in thus remanding him, but is in duty bound to protect the prisoner from unlawful restraint and death.

(Decided January 5, 1895.)

BUCHWALTER, J.

This hearing is in extradition proceedings. The Governor of Kentucky made requisition on the Governor of Ohio for the prisoner as a fugitive from justice. The Governor of Ohio thereupon issued his warrant to the sheriff of this county. The prisoner was arrested and brought before me, as one of the judges of this court, "to be dealt with according to law." On the 31st day of December, 1894, after a partial hearing, the inquiry was continued to January 4, and, on its final submission, is now to be determined.

On the first hearing it appeared that the prisoner was named in the requisition papers as the agent of the state of Kentucky. On the final hearing, by leave of court, substituted copies are made correcting that error.

Various defects are now claimed in the extradition official documents. Counsel agree that all the records and documents submitted to the Governor of Ohio are in duplicate before me. I shall only consider one, viz., whether a crime is charged against the prisoner. In this regard Governor Brown's requisition recites that A. H. Hampton, fugitive from justice from the state of Kentucky, is charged with "shooting and wounding with intent to kill," but does not contain any recital of any annexed indictment, affidavit or court record, or any reference thereto; nor is there any averment specifying or charging crime against the prisoner, or any document attached or annexed to the requisition.

The warrant of Governor McKinley recites the offense charged in the same words: "Shooting and wounding with intent to kill," and then adds, in printed form: "As appears by a copy of indictment duly authenticated and attached to the requisition aforesaid."

The counsel for Kentucky offer in proof what they claim is a certified copy of an indictment against the prisoner, and it is agreed that it is a true duplicate in form and certification of the paper submitted by the Governor of Kentucky to the Governor of Ohio, and described in the warrant as an indictment.

To this paper counsel for the prisoner object, in that it is not duly authenticated as a record. And they object, also, to the sufficiency of the requisition and the warrant, for that they do not state a crime.

E. M. Blakeman certifies, as Clerk of Green County Circuit Court, state of Kentucky, that the document is a true copy of an indictment against A. S. Hampton, as found in his office, dated January 2, 1885, duly signed, but without any official seal.

W. H. Milby certifies, as Judge of Greene County Court, that the same is a true copy of the indictment, etc., in the office of said clerk, and subscribes the same with his official signature.

There does not purport to be any certificate or statement by the Governor of Kentucky that such paper is a copy of an indictment of that, or any court in his state. In brief, there is no copy of an indictment found or affidavit filed, charging crime against Hampton in any court of Kentucky, *certified by the Governor as authentic,* as is specifically required by section 5278, of the Revised Statutes of the United States, as set out below, nor as per the provisions of the Revised Statutes of Ohio in that regard. (Nor, as is manifest, is such purported copy of the indictment certified accord-

ing to the act of congress, section 905, Revised Statutes of the United States, as to the authentication of court records generally for use between the states, there being no certificate that Blakeman is Clerk, or Milby Judge.)

It is clear, therefore, on the proof before me, that the law has not been complied with as to producing the duly authenticated copy of the indictment on which to found extradition. See Church on Habeas Corpus, sec. 479, and note. And see discussion of authentication by the governor in *ex parte Sheldon*, 34 Ohio St. 319; *Soloman's case*, 1 Abb. pr. 347; 9 Wend. 220; *Pfitzen's case*, 28 Ind. 450.

The independent recital in the requisition, and the warrant of "shooting and wounding with intent to kill," does not state a crime under the laws of Kentucky, sec. 1166 (as put in proof). The shooting and wounding must be of a person. No presumption can be made against a prisoner. He is to be adjudged by strict construction of the charge against him. Upon such papers and records, therefore, as are competent to be considered, there is no crime charged against the prisoner, and he can not be remanded.

It is proper, however, that I clearly state my position upon another feature of this case briefly adverted to by me at the first hearing.

The foundation of the extradition system is section 2, article 4, of the federal constitution, viz. : " A person charged in any state with treason, felony or other crime, who shall flee from justice and be found in another state, shall, on the demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime."

To carry this provision into effect, congress passed the act of February 12, 1793, in relation thereto. A part of the provisions thereof was re-enacted in sec. 5278, as follows:

"Whenever the executive authority of any state or territory demands any person as a fugitive from justice, of the executive authority of any state or territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any state or territory, charging the person demanded with having committed treason, felony or other crime, certified as authentic by the governor or chief magistrate of the state or territory from which the person so charged has fled, it shall be the duty of the executive authority of the state or territory to which such person has fled, to cause him to be arrested and secured, and to cause notice to be given to the executive authority making such demand, or to the agent of such authority, appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent, when he shall appear."

The legislature of Ohio, February 2, 1884, in sections 95-6-7, and sections 7156-57-58, supplemented the federal constitution and the legislation of congress by placing a number of limitations upon proceedings in extradition, the principal in these limitations being : That demand for extradition must be accompanied by sworn evidence that the party charged is a fugitive from justice, and that the demand is made in good faith, for punishment of crime, and not for the purpose of collecting a debt or of removing the alleged fugitive to a foreign jurisdiction, with a view to there serve him with civil process; requiring the prosecuting attorney of the proper county to set forth all the facts of the case and the reputation of the party asking for the requisition, and to state whether, in his opinion, the requisition is sought from improper motives, or in good faith to enforce the criminal laws of Ohio; *requiring that the alleged fugitive be taken before a judge of the supreme court or common pleas court to be examined on the charge, such judge to hear and examine the charge,* and, upon proof made in such examina-

tion, by him adjudged sufficient, to commit the alleged fugitive to the county jail, and give notice to the executive authorities of the state wherein the fugitive is wanted, or to the agent of such state.

Much legal contention is made as to the validity of the provisions in the Ohio statute, in such parts thereof as stipulate the procedure in matters provided by the act of congress; but in this case I shall only consider certain of the provisions as hereinafter stated.

Neither the agent of the demanding state, nor the officer arresting the fugitive under the warrant of the governor are officers of the United States. * * * * The states have the right to impose the duty on their own courts or the judges thereof to inquire into the grounds upon which any person within their jurisdictional limits is restrained of his liberty, and to discharge him, if the restraint is illegal, and this, notwithstanding such illegality may arise from the violation of the laws and constitution of the United States. *Robb* v. *Connolly*, 111 U. S. 624. As every alleged fugitive under arrest on his application would be entitled to a hearing before a judge or court in *habeas corpus*, and as section 97, of the Revised Statutes of Ohio, is but a provision that before a governor shall remand a prisoner to another state, he shall cause him to be brought before a judge for a hearing like unto that in *habeas corpus*, such statutory direction does not conflict with the foregoing act of congress, or said constitutional provision. *Wilcox* v. *Nolze*, 34 Ohio St. 520.

The legislature of Ohio has undertaken to make certain regulations for the exercise of the discretion on the part of the governor, directing him to refuse a warrant where the prosecution is not in good faith, and giving a legislative instance of where it is instituted merely to collect a debt.

The refusal of a governor to issue his warrant, and his withdrawal of a warrant once issued by him, or his predecessor, has been approved, and sustained by our Supreme Court. *Work* v. *Corrington*, 34 Ohio St. 64.

In that case the court cites the exercise of discretion on the part of many of our governors in withdrawing warrants issued in extradition, notably one by Governor Brough, who stated on the record as a reason for the revocation that "*soon after the issuing of the warrant, information was received that this requisition had been obtained for an ulterior object.*"

Attorney-General Henry Stanbery, in an opinion to Governor Bebb, insists, "that a governor, under some circumstances, may withhold the warrant."

These were distinguished constitutional lawyers, whose opinions we may well regard in the direction of duty.

In the opinion by Judge OKEY, he says: "More than one hundred and fifty judges in this state have the unquestioned authority to discharge where the proceeding is plainly invalid by reason of defects in the matter of substance, and I am unable to see why the governor who grants and issues the process should have less power over it."

In the case before me, certain proofs and facts are presented on the hearing, which necessarily were not known to the Governor of Ohio issuing the warrant. It is upon his order, in accordance with the legislative provision, that the prisoner for the first time is brought before any one having a duty to perform in the nature of a hearing.

In *Wilcox* v. *Nolze*, the governor found the prisoner to be a fugitive from justice, and ordered his arrest and appearance before a court of examination. The court, on examination, found he was not a fugitive from justice and discharged the prisoner. The Supreme Court affirmed the common pleas, thus authorizing the jurisdiction of that court.

It was also distinctly held in that case, as stated in the first syllabus, that "the power of a judge to discharge an alleged fugitive from justice un-

der the act of 1875 (72 Ohio Laws, 79), is essentially the same as under the *habeas corpus* act. (75 Ohio Laws, 754.)"

The proof before me not only raises a strong probability, but is convincing that the prisoner would have been dealt with unlawfully had I remanded him just preceding New Year's day, and would be now without any outspoken assurance from those in authority that he will be protected. His own testimony was peculiarly impressive, giving corroborating facts and circumstances as to threats and the probabilities of violence in that vicinity, especially to one of his color, charged with an offense against a white man. Some of these circumstances are tacitly admitted by the agent of Kentucky.

The statistics before me show that nineteen people have been illegally executed in the state of Kentucky within the past twelve months, by lynching in the exercise of individual vengeance, twelve of them within the past six months, whose names, dates and places of death are given. One of these was Louis Lafardette, killed at midnight, July 16, 1894, just after I, as judge of this court, had remanded him upon the requisition of the Governor of Kentucky and the warrant of the Governor of Ohio. The processes of law *were in due form*. His offense was shooting to wound or kill the prosecuting witness, who soon after appeared in this court (with his wounded hand) to identify the prisoner. So far as I can learn, there has been no effort by the executive officers of Kentucky to prosecute his murderers, nor, in fact, any of the nineteen mobs who murdered citizens in that state. Nor have I learned of any regrets expressed to those who love law and order, for the bad faith in thus killing the prisoner remanded from this state, by official authority, to be tried according to law, upon the charge contained in the requisition.

I do not recite these horrible deeds to irritate or to be disrespectful to any one, but these are facts brought to my knowledge (as to Lafardette, painfully so), and are proper to be considered by me in connection with the other proof as to my duty in remanding this prisoner.

Looking backward to the Lafardette case, it is now quite certain that those desiring to lynch him went through the form of beginning criminal proceedings, and based on these obtained the requisition of the Governor of Kentucky, and then the warrant of the Governor of Ohio, and finally the order of this court. Is there any doubt that the forms of the law were used for none other than the wicked and unlawful purpose of bringing the prisoner into a convenient place to kill him? Had we then the information by foresight we now have, is it to be held to be the law that the constitution of the United States would have made it the duty of either the governor or myself to aid in thus surrendering that prisoner to violence, because it was asked in due form of law?

When I am now satisfied that a like purpose is intended in these proceedings as to Hampton, is it my duty, because of the due form of law, to send him to unlawful death? I answer, No! It would be a perversion of the purposes of the constitutional provision.

Most certainly I agree that when the proceedings are in due form of law, good faith is to be imputed to them, and to the purposes for which they are instituted; but that presumption may be overcome by proof to the contrary.

The sole purpose of the constitutional provision is to remand a prisoner for trial according to law, and not to destroy him by individual vengeance.

When is that inquiry to be made? Surely not after he has been remanded, for if the purpose is unlawful, as in Lafardette's case, it is then too late to save life. It is at the time of the application to the governor, or in last resort to a court.

Where there is no overcoming proof of bad faith or purpose, it is the duty of the governor, and maybe of the judge, to aid in enforcing extradition ; but it is a moral duty which could not be enforced against the governor or the judge by mandamus, or any legal proceeding. See *Commonwealth of Kentucky* v. *Governor Dennison*, 24 How. 66.

I have examined many authorities, their facts and their reasons, not necessary here to quote or consider, but in all of them, where it is held to be the bounden duty of one state executive to issue his warrant at the demand of another, it is upon the theory that such demand and prosecution in one state is in good faith to extradite a prisoner for prosecution according to law.

It is an old rule in equity that if the petitioner does not come into court with clean hands, his cause will be dismissed without regard to the fault of the respondent; or, if a fictitious plaintiff be set up to act as a stool-pigeon for the one in interest, and not in good faith, asking an equitable relief in his own behalf, then, too, his petition must be dismissed.

If these extradition proceedings had been regular as to form, had by duly authenticated court records charged a crime, and the proof established that he was a fugitive from justice, it would be my duty to remand the prisoner to the sheriff for delivery to the agent of the demanding state, save as I have said for the proof before me that he can not securely take back and keep him safe for trial by law.

I, therefore, asked him to get me the assurance of the trial judge (who reasonably would know the state of feeling and the probabilities of safety locally), and of the governor of the state, as the head of the executive powers thereof, and amply able, if forewarned, to protect the prisoner from violence.

I felt myself in duty bound to do this before becoming knowingly a judicial agent to deliver a second prisoner most probably into violent hands. If the governor had been thus forewarned in Lafardette's case, I might not now bear in memory that I was unwittingly an agent in the name of law to his violent death. And if such assurance were given in this case, either directly to the judge, or indirectly through the Governor of Ohio, it would have been in the interest of humanity, and have served in the execution of justice according to the forms of law.

Besides, it would have rallied the adherents of law and order, who predominate in numbers in every community of that state as elsewhere in this country.

If I have erred by an over-zealous care in this regard it is, to my mind, with a higher sense of duty under my oath to support the constitution of the United States than if I negligently aided in executing a process under constitutional form used for ulterior and illegal purposes.

I would not on this ground remand the prisoner to Kentucky, and would hold him for the further consideration of the Governor of Ohio, but considering the defects found in the requisition papers, after a second attempt to have them correct, I now discharge the prisoner.

*Schwartz* and *Rulison, Prosecuting Attorneys,* representing the agent of Kentucky.

*Dye & Dye,* for the prisoner.