[See Case No. 3,560.]

## Case No. 9,150.

### In re MARTIN.

[6 Ben. 20.] [1]

District Court, S. D. New York. April, 1872.

BANKRUPTCY — ERRONEOUS ADJUDICATION — CO-PARTNERSHIP.

On the petition and schedules of one member of a copartnership, an adjudication of bankruptcy of the firm was made. It appeared that neither of the other members of the firm had consented to the adjudication of bankruptcy, and that they had no place of business within, and resided out of, the district where the petition was filed: Held, that the adjudication as to the other members of the firm was erroneous, as the court was without jurisdiction as against them, and that as to them such adjudication must be vacated, but should be allowed to stand as to the petitioning member.

On the 16th of March, 1872, on the petition and schedules of Henry Martin, a member

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

## Case No. 9,151.

### In re MARTIN.

[5 Blatchf. 303.] [1]

Circuit Court, S. D. New York. Feb., 1866.

CERTIORARI — HABEAS CORPUS — COMMISSIONER — MINUTES OF EVIDENCE—CONSPIRACY— SUFFICIENCY OF EVIDENCE.

1. The courts of the United States have power, under the 14th section of the judiciary act of September 24th, 1789 (1 Stat. 81), to issue the writ of certiorari, as ancillary to the writ of habeas corpus, as a means of rendering their jurisdiction under the latter writ effective.

[Cited in Re Macdonnell, Case No. 8,772.]

2. Where a prisoner is committed by a United States commissioner, to await the action of a grand jury of a circuit court of the United States, that court, in connection with a habeas corpus, to inquire into the cause of his commitment, has power to issue a certiorari to the commissioner, to bring up the proceedings which took place before him.

[Cited in Re Coleman, Case No. 2,980.]

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

3. The functions exercised by a United States commissioner, in committing a prisoner to await the action of a grand jury, considered.

[Cited in U. S. v. Martin, 17 Fed. 155.]

4. The court, on a habeas corpus, is not concluded by the finding of the committing magistrate, but may go behind his order of commitment, and, by a certiorari, look into the evidence taken before him.

[Cited in Re Van Campen, Case No. 16,835; U. S. v. Brawner, 7 Fed. 87.]

5. To this end, the court may require the production before it of the minutes of oral evidence taken by the commissioner, and of any written depositions, and may examine the commissioner as to evidence taken by him and not reduced to writing, and as to lost minutes of evidence.

6. The admissions of an alleged co-conspirator, made after the conspiracy has terminated, and not in the presence of the accused, are not evidence against the latter.

7. Communications which pass between client and counsel are inviolable, and the latter cannot be compelled to disclose them.

8. A prisoner committed by a United States commissioner, for a crime against the United States, to await the action of a grand jury of this court, was discharged by this court, on habeas corpus, on the ground that the evidence before the commissioner, brought up on certiorari, was not sufficient to warrant his commitment.

This was a writ of habeas corpus directed to the marshal of the Southern district of New York, commanding him to bring the body of Robert M. Martin before the court. As the petition for the writ alleged that the prisoner was detained in custody under a warrant of commitment issued by a United States commissioner, a writ of certiorari, also, was issued by the court to the commissioner, directing him to send up the proceedings and evidence upon which such commitment was founded. By his return to the habeas corpus, the marshal justified his detention of the prisoner, by setting forth the order of the commissioner, and also produced the body of the prisoner in court. No formal return was made to the certiorari, though the commissioner was in court, with his proceedings in the premises, ready to comply with such order as the court should make thereon. The district attorney, on behalf of the United States, moved to quash the certiorari, on the ground that the commissioner possessed co-ordinate jurisdiction with this court to commit, for the action of the grand jury, persons charged with crime, and that, therefore, this court had no power to revise his action therein. It was insisted, on behalf of the government, first, that the court had no power to grant the writ; and, second, that, if it had, the writ could lawfully operate only to bring up the formal records and files of the commissioner in the case, and that the evidence taken before the commissioner was no part of such records or files, and, therefore, not within reach of the writ. The principal question discussed, on the argument, was the power of the court, through the medium of a writ of certiorari, to bring before it the evidence upon which the commitment was made.

Daniel S. Dickinson, Dist. Atty., for the United States.

Jeremiah Larocque, for prisoner.

SHIPMAN, District Judge. The power of this court to grant the writ of habeas corpus is not denied, and, therefore, need not now be dwelt upon. Neither shall I discuss at much length its power to grant the writ of certiorari, as ancillary to the former writ. The courts of the United States being courts of limited, though not of inferior jurisdiction, their powers must be sought for in the acts of congress. The 14th section of the judiciary act of September 24th, 1789 (1 Stat. 81), provides, "that all the before-mentioned courts of the United States shall have power to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law. And that either of the justices of the supreme court, as well as judges of the district courts, shall have power to grant writs of habeas corpus, for the purpose of an inquiry into the cause of commitment. Provided, that writs of habeas corpus shall in no case extend to prisoners in gaol, unless where they are in custody under or by color of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify." Under the authority conferred by this act, the writ of habeas corpus has been repeatedly granted by the courts of the United States, and by the judges thereof. And, although the power to issue the writ of certiorari is not conferred by name, it is no doubt included under the general terms, "all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law." Accordingly, the supreme court of the United States, in Ex parte Burford, 3 Cranch [7 U. S.] 448, and in the case of Ex parte Bollman, 4 Cranch [8 U. S.] 75, issued the writ of certiorari, as well as that of habeas corpus. These precedents would be quite sufficient to warrant this court in the exercise of its power to issue the former writ, for, jurisdiction in cases of habeas corpus is conferred upon the supreme and circuit courts by the same words of the act, as well as the power to issue all other writs which may be necessary for the exercise of jurisdiction. The writ of certiorari has always been considered, in appropriate cases, as ancillary to that of habeas corpus, and has long been issued by the courts of England and this country, as a means of rendering their jurisdiction under the latter writ effective. It is said, in Bacon's Abridgment (title "Habeas Corpus," B 3): "As the certiorari alone removes not the body, so the habeas corpus alone removes not the record itself, but only the prisoner with the cause of his commitment; and, therefore, although,

upon the habeas corpus, and the return thereof, the court can judge of the sufficiency or insufficiency of the return and commitment, and bail or discharge or remand the prisoner, as the case appears upon the return, yet they cannot, upon the bare return of the habeas corpus, give any judgment, or proceed upon the record of the indictment, order, or judgment, without the record itself be removed by certiorari." Numerous cases, in the English, federal, and state courts are found, where a certiorari, in connection with a habeas corpus, has been issued. Hamond v. Howell, 1 Mod. 184; King v. Marks, 3 East, 157; King v. Taylor, 7 Dowl. & R. 622; the cases in Cranch, already cited; Edmonds, J., in People v. Martin, 1 Parker, Cr. R. 187. In the last case cited, the power was given by the statute, but in language which plainly indicated that the act, in that particular, was declaratory of what the law was, rather than remedial. The prisoner having been committed to await the action of the grand jury in this court, I have no doubt that, upon principle, by the power conferred by the act of congress, and upon the decided cases, this court is fully authorized to issue the writ of certiorari in connection with the writ of habeas corpus.

The next question is—what proceedings of the committing magistrate is the certiorari to operate upon and remove into this court? In determining this question, it is proper to notice, in the outset, the functions exercised by the commissioner in committing a prisoner to await the action of the grand jury. In this respect, he exercises the powers common to all ordinary committing magistrates. If he finds probable cause to hold the party for trial, he commits him; if not, he discharges him. In neither case is his action final, or a bar to further proceedings. If the prisoner is discharged, he may be again arrested, and, on sufficient evidence, may be committed. If he is committed, he may apply to the court to reduce his bail, or the prosecuting officer may apply to have it increased, or to discharge him altogether. In none of these proceedings of the commissioner are his orders in the nature of a final judgment of a court of record; and it is a common practice for courts, in England and in this country, to which a party is committed for trial, to revise just such orders as the commissioner has made in the present case. This court has repeatedly increased and diminished bail fixed by commissioners, and its authority has never been questioned. Now, in order that this court may exercise intelligently its undoubted authority over such matters, it must be able to go behind the mere formal order of commitment. In order to fix the amount of bail, it must be possessed of sufficient evidence as to what are the peculiarities of the offence committed—whether it is a merely technical breach of law, or one attended by circumstances of peculiar aggravation or atrocity. This court had occasion, not long since, on the application of a former dis-

trict attorney, to inquire extensively into evidence for the purpose of fixing the bail of a swindler whose depredations on the treasury had been enormous. Indeed, the 33d section of the judiciary act expressly requires the court, in fixing bail, in certain cases, to regard "the nature and circumstances of the offence and of the evidence, and the usages of law." Now, in order to pass upon the evidence, the court must have the same before it. If it is not brought voluntarily into court, the court must have some power to compel its production. The witnesses are not always within its immediate reach, having given their testimony before the commissioner, and gone to distant homes. In some cases, they are abroad, or on the high seas, and the prisoner stands committed on depositions sent home by consuls residing in foreign ports. It is a common practice, for courts in most places where the common law exists, to bring before them the evidence produced before the committing magistrate, and upon which his commitment is founded; and, where this evidence is reduced to writing, in the form of depositions, whether by the committing magistrate or by other competent authority, this is frequently done by a certiorari, in aid of a habeas corpus. But, in whatever manner the evidence is brought before the court, the court is not concluded by the finding of the committing magistrate. 2 Strange, 911, note; King v. Marks, 3 East, 157; Van Boven's Case, 9 Adol. & E. (N. S.) 676; Ex parte Tayloe, 5 Cow. 39; People v. Martin, 1 Parker, Cr. R. 187. In the case of Ex parte Bollman, 4 Cranch [8 U. S.] 114, Chief Justice Marshall remarked: "I understand the clear opinion of the court to be (if I mistake it, my brethren will correct me) that it is unimportant whether the commitment be regular in point of form or not; for, this court, having gone into an examination of the evidence upon which the commitment was grounded, will proceed to do that which the court below ought to have done."

The only plausible doubt suggested in the present case is, as to the power of the court to compel the production of the minutes of the evidence taken by the commissioner. The law does not, in terms, require the commissioner to reduce the testimony of witnesses to writing, although this is generally done by those magistrates, in important cases. If this objection were to prevail, it would only produce embarrassment; for, it often happens, that the evidence upon which a commitment is founded consists in part of depositions taken abroad by consuls, and in part of oral testimony taken before the commissioner, and by him taken down in his minutes. The witnesses who thus testify sometimes leave for remote places, and, where they are officers of a ship, often depart on another voyage before the final trial; and it would be strange indeed, if, on an application to discharge or modify bail, the court were to be deprived of the power to examine into the evidence thus informally taken, while it

would be compelled, in the exercise of a solemn duty, to look into that contained in formal depositions. Under such an administration of justice, the government as well as the accused would often be deprived of material evidence, and the power of the court to properly dispose of the case would be greatly impeded. In such a case, the court would certainly be justified in requiring the commissioner to produce his minutes, and, if he had failed to take them, or if they had been lost or destroyed, to summon him, and examine him under oath touching the evidence upon which his commitment was founded. Indeed, this very course of proceeding has been reduced to a formal rule of practice by at least one court of the United States, of high intelligence and extensive jurisdiction. Ex parte Bennett [Case No. 1,311]. It would be more satisfactory, if the minutes of the commissioner were always formally taken, and the testimony of the witness read over to him, and subscribed by his own hand; but the absence of this formality cannot be permitted to paralyze the arm of this court, and destroy its power to do justice to both the government and the accused.

The importance of this power of the court, to look into the evidence as far as may be necessary, in order to decide whether it is proper or not to hold a prisoner in confinement, will be clearly seen on examining the condition of things if no such power existed. One of two results would follow. Either the prisoner would be kept in confinement just as long as the prosecution might see fit to hold him, or the court would be compelled to make a mere arbitrary order limiting the time within which he should be indicted or discharged. It often happens that prisoners are brought into a district for trial, long before the necessary evidence can be obtained for submission to the grand jury. This happens more frequently in the case of crimes committed on shipboard, in remote parts of the world; but it may and does occur in other instances. In such cases, the court would not, unless compelled to do so, arbitrarily limit the time within which an indictment should be found or the prisoner be released. It would be all-important that the court should look into the evidence upon which the prisoner was committed, that it might determine whether or not the circumstances surrounding the commission of the alleged crime were such as to warrant his further detention in the absence of an indictment. The extent of a justifiable delay would be different in different cases, depending upon the evidence. To put an order upon the district attorney, that he should have his indictment in court by a given day, or that the prisoner be discharged, without looking into the evidence, would be a blind exercise of power, little meriting the term judicial. This the court would be compelled to do, unless it had control over, and the power to examine into, the evidence, or else leave the prisoner virtually in the hands

of the prosecutor and to such term of confinement as he might think proper. Of course, no prisoner would be unreasonably detained under the official sanction of the distinguished and enlightened gentleman who now fills the office of prosecutor in this district. But this court, in the discharge of its duties, can be no respecter of persons, nor can it decline any of the responsibilities imposed upon it by the constitution and the laws. It is its duty to see that every person committed to its custody, whether under or awaiting indictment, has a speedy, as well as a public and an impartial trial; and it should accomplish this great object in such manner that the ends of public justice may be attained and the rights of every prisoner be preserved and protected.

There is another important consideration which it is proper to advert to. As this court has the power to issue writs of habeas corpus, for the purpose of inquiring into the cause of commitment (1 Stat. 81, § 14; Ex parte Watkins, 3 Pet. [28 U. S.] 193, 201) it would be compelled, in the exercise of this power, where the warrant of commitment was irregular and void on its face, to discharge from arrest, unless it could go behind the warrant and examine into the evidence upon which it was founded. This, as I have already shown, would sometimes be impracticable, unless the court could resort to the evidence upon which the commissioner acted, and which might be within reach of the court, on the return to the habeas corpus, only through the commissioner's minutes or his own testimony. For these reasons, the commissioner who committed the prisoner in this case must answer the certiorari, by producing the evidence taken before him. As this evidence was, I suppose, substantially reduced to writing by him on the hearing, it will be sufficient to produce his minutes thereof, and the affidavit upon which the original warrant of arrest was issued. The warrant itself and the order of commitment are already before the court.

To avoid all misconception, it may be well to remark, that the principles here laid down, have no necessary relation to the powers conferred upon commissioners under the laws touching the execution of extradition treaties.

The return to the certiorari having been made in conformity to the above decision, and the question of the further detention or discharge of the prisoner having been heard, the court proceeded to render the following decision:

SHIPMAN, District Judge. The evidence and proceedings upon which the prisoner, Robert M. Martin, was committed to await the action of the grand jury in this court, have been carefully examined and considered by the court. The question now to be determined is, whether he shall be remanded or discharged.

As the authorities are somewhat conflicting, touching the degree of certainty with which the affidavit, warrant of arrest, and

commitment should specify the offence, I pass over their form in this case, with the simple remark, that they are extremely general, not to say vague and uncertain. One charge appears to be founded on the fourth section of the act of February 26th, 1853 (10 Stat. 170), entitled "An act to prevent frauds upon the treasury of the United States." It alleges, that the defendant, on the 1st day of November, 1864, within this district, "did knowingly attempt to destroy certain public records of the United States," without stating what records. The other charge is, that the prisoner "did knowingly and wilfully engage in giving aid and comfort to the then existing rebellion against the authority of the United States, and against the laws thereof." This offence, also, is alleged to have been committed in this district. This charge is grounded on the 2d section of the act of July 17th, 1862 (12 Stat. 590). The warrant of arrest contains the same charges, and the order of commitment is endorsed on the warrant of arrest, and refers to the charges within the same. It also states, that the commissioner has examined into the offences charged, according to law, and commits the accused to the custody of the marshal, to be by him held, in default of bail, to await the action of the grand jury.

By the decision of the commissioner rendered before the final commitment, he appears to have held that the charge of attempting to destroy public records of the United States was not made out, and that, therefore, the prisoner was entitled to his discharge, so far as that ground was concerned. It seems, however, that he was of opinion that the general charge of having given aid and comfort to the then existing rebellion, was so far supported as to warrant the commitment of the prisoner. It is only necessary, therefore, as I concur in the opinion of the commissioner as to the charge of attempting to destroy public records, to consider the evidence touching the charge of giving aid and comfort to the rebellion. I shall not dwell at any length upon this evidence, but, as the commissioner informs me that the copy furnished to me is substantially correct, I shall direct the clerk to append the same to, and file it with, this opinion.

An examination of the whole evidence taken on the hearing shows, that the prisoner was in New York about the time of an alleged attempt to burn that city, under suspicious circumstances; and the principal facts which are legal evidence at all, are, first, that he went under an assumed name; and, second, that he was. more or less, in company with certain characters to whom suspicions had attached, and one of whom was subsequently executed by the military authorities, as one of the incendiaries. I assume. rather than decide, that the second fact was admissible evidence against the prisoner. The intelligent assistant district attorney clearly

saw that these facts, as they then stood on the proofs, only raised a general suspicion that the prisoner was here for no good purpose; and, in order to make out a case which would warrant the commitment of the accused, he offered evidence of certain declarations made by other parties, some or all of which were made in Canada, and none of them in the presence of the prisoner. The primary tendency of these declarations was, to establish the charge in the affidavit and warrant, of attempting to destroy public records, by burning the city. These declarations were made after the attempt had been consummated, and, so far as can be judged by the proofs, after the alleged conspiracy for that object had terminated. They were, therefore, inadmissible for that purpose; for, the admissions of an alleged co-conspirator, made after the conspiracy has terminated, and not in the presence of the accused, are not evidence against the latter. The commissioner appears to have taken this view of the law, and to have exonerated the prisoner from the alleged attempt to destroy public records by fire.

The only feature of the evidence, from which it can be in any manner inferred that the prisoner, at any time, within this district, gave aid and comfort to the rebellion, is that which was supposed to connect him with those fires. The destruction of the city by fire, involving the destruction of the public records of the United States, was the only act of aiding the rebellion, committed here, of which the evidence gives the remotest suspicion. The commissioner, as I have already stated, decided, and properly decided, that probable cause in support of this fact was not made out. The fact having failed, the inference fails also. It will, I presume, not be contended that the color of the defendant's carpet-bag, or the fact that he had a small amount of gold, supplies any material evidence in the case.

Some testimony was taken tending to show that the prisoner had been an officer in the rebel army. This was obtained from General Whittaker, one of the counsel for the prisoner on this very hearing, by putting him upon the stand as a witness for the prosecution. After the declaration of this witness that he had no personal knowledge about the prisoner during the rebellion except what he had learned from him in his capacity as counsel, the commissioner should not have permitted the examination to be further pressed. I need not cite authorities, or adduce reasons, in support of the inviolability of communications which pass between counsel and client. The highest considerations known to the law guard this relation with jealous solicitude. But, even if the personal knowledge of General Whittaker were admissible, the reputation of the prisoner as a rebel, upon which he was questioned, was wholly inadmissible. And, if we assume that it was legally proved on the hearing, that he had been in the rebel

army, this would not tend to show that he had committed a crime in this district, unless the fact was in some manner connected with an unlawful act done here. As I have already remarked, the only act done here, to which the evidence relates, is the alleged attempt to burn the city; and of this the commissioner found no proof which would warrant him in deciding that probable cause had been made out.

It follows, from these views, that there was no sufficient evidence to warrant the commitment of the prisoner for trial in this district. He must, therefore, be discharged from custody under this warrant or order of commitment, and a proper order will be entered to that effect.